Filed 12/19/25  P. v. Easter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEVIN JEROME EASTER,<br><br>        Defendant and Appellant. | A167502<br><br>(Contra Costa County Super. Ct. No. 04-00197959-0) |

On August 7, 2013, Janice Easter was shot five times and killed in the living room of the home she shared with her husband, defendant Kevin Easter.  In 2015, a jury convicted Easter of her first degree murder, and the trial court later sentenced him to 65 years, eight months to life in prison.  In 2019, we reversed his conviction on the ground that the trial court erred in failing to reinstate competency proceedings after his trial counsel presented evidence that he was experiencing new and worsening symptoms of a mental health condition.  (*People v. Easter* (2019) 34 Cal.App.5th 226, 229 (*Easter*).)

In 2022, Easter was put on trial a second time for Janice's murder.  A jury again convicted him of first degree murder and possession of a firearm by a felon, and the trial court sentenced him to 75 years to life in prison.  Easter argues that:  (1) the trial court erred in admitting a computer-aided dispatch log showing that Pittsburg Police Officer Sibbitt requested a records check of the murder weapon's serial number while inside the Easter home on

1

August 4, 2013; (2) the prosecutor committed misconduct by referring to evidence regarding the serial number during opening statement; (3) the trial court erred in admitting certain hearsay statements of the victim as well as prior incidents of domestic violence between Easter and D.C. under Evidence Code section 1109; (4) trial counsel provided ineffective assistance in failing to object to testimony by Janice's daughter, Paris Washington, regarding having seen a firearm in the Easter home; (5) the trial court erred in giving the jury standard instructions on flight and suppression of evidence as evidence of the defendant's consciousness of guilt; (6) the cumulative effect of the alleged errors requires reversal; and (7) insufficient evidence supports the jury's finding of premeditation and deliberation in support of Easter's conviction for first degree murder. We find these arguments to be without merit, and we affirm.

BACKGROUND

**The First Trial and Appeal**

As we briefly summarized Easter's first trial and conviction in our 2019 opinion: "On the night of August 7, 2013, Janice Easter, defendant's wife of five years, was shot to death in the living room of the home she shared with defendant. Defendant was arrested shortly after the murder. A March 26, 2014 information charged him with murder with a firearm enhancement and felon in possession of a firearm, further alleging he had three prior serious felony convictions and three prior strikes. [¶] . . .

"[I]n May 2014, defense counsel declared a doubt regarding defendant's competency to stand trial, and the criminal proceeding was suspended pending the outcome of a Penal Code section 1368 competency proceeding. In April 2015, a jury found defendant competent to stand trial, and the homicide case resumed.

2

"In October 2015, after defense counsel twice unsuccessfully renewed the issue of defendant's competency, defendant was tried before a jury, which found him guilty of first degree murder and found true the personal use of a firearm allegation. Following a bench trial, the trial court found defendant guilty on the firearm possession charge and found true the prior serious felony conviction allegations.[1] He was sentenced to 65 years eight months to life in state prison." (*Easter*, *supra*, 34 Cal.App.5th at p. 229.)

On March 13, 2019, we decided defendant's first direct appeal, agreeing with his argument that the trial court erred in failing to reinstate competency proceedings because his counsel had presented substantial evidence that he was experiencing new and worsened symptoms constituting a substantial change of circumstances in his mental condition, and reversing his conviction on that ground. (*Easter*, *supra*, 34 Cal.App.5th at pp. 242–249.)

**The Second Trial**

On October 21, 2019, the Contra Costa County District Attorney filed an information again charging Easter with his wife's murder (Pen. Code[2], § 187, subd. (a)) (count 1), with an enhancement for intentionally discharging a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)); and possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 2). The information further alleged that Easter had four serious or violent prior

---

[1] "Per the prosecutor, because defendant had not waived a jury trial on the strike allegations and the jury had been discharged, those allegations were moot."

[2] Further undesignated statutory references are to the Penal Code.

felony convictions (§§ 667, subds. (d) & (e), 1170.12, subds. (b)–(c)) and two prior serious felony convictions (§ 667, subd. (a)(1)).

Trial began with opening statements on November 7, 2022, and continued over approximately 12 court days in November and December.

As relevant to the issues on appeal, some of the testimony at Easter's second trial was as follows.

In August of 2013, Easter was living with his wife, Janice Easter, on Army Street in Pittsburg. Easter had recently purchased a Ford F-150 pickup truck from Willy Senn, his neighbor who lived across the street. The front fender of the truck was painted grey with primer, and the rear portion was blue.

At approximately 10:24 p.m. on the evening of August 4, Pittsburg Police Officers Ryan Davis and Mike Sibbitt were dispatched to the Easter residence in response to a "pocket dial" to 911. When the officers arrived, Janice was standing in the doorway of the residence pointing and yelling at Easter, who was in the front yard walking away from the house.

Officer Sibbitt went into the house with Janice and remained inside for approximately 20 minutes, while Officer Davis waited in the front yard with Easter.[3] While they waited, Officer Davis heard Officer Sibbitt contact dispatch. And as will be discussed in further detail, the computer-aided dispatch log of the 911 call indicates that Officer Sibbitt did so in order to request dispatch run a records check on a firearm with serial number DW63853.

According to Officer Davis, when Officer Sibbitt returned from inside the house, they "released [Easter] on scene and then watched him leave because he was leaving for the night." And the next morning at 9:34 a.m.,

---

[3]    Officer Davis testified at trial, but Officer Sibbitt did not.

4

Easter sent a text message to Janice (listed in his phone as "Wife") that read, "Can you tell someone to let me in, please?"

On the evening of August 7, Willy Senn was in his front room with the door open watching television when he "heard one shot go off across the street." Senn called 911 and reported the shot, and then "got up and went out to the front door and went out onto the front porch." Senn then "heard three more shots go off" and started walking across the street. When he got to the middle of the street, he saw a "truck drive off at a high speed." He did not see the driver, but he recognized the truck as belonging to Easter because he had sold it to him a "[w]eek or two" prior. Another neighbor, Jovan Pervoe, saw a bald black male with a beard exit the Easter home, lock the door, and drive away.[4]

Other neighbors on Army Street also heard gunshots. Marisa Avila was on her way to her car when she heard a single gunshot, followed by a female scream. She ran back inside her house and told Pervoe, her husband, "I think somebody got shot." She then heard two additional gunshots. And Margarita Reyes heard one gunshot, followed by a "pause" of "a few seconds," and then several more gunshots. Jose Roman was taking the trash out with his mother when he heard "just one" gunshot, and "seconds" later, several more.

Senn went across the street to Easter's house and found the door locked. He knocked, but no one answered. Soon police officers began to arrive, and at 11:21 p.m. they forced entry to the house by kicking the door down. Inside, they found Janice on the couch with multiple gunshot wounds to her torso and a "faint pulse." Various belongings were gathered on and

---

[4] At Easter's 2015 trial, Pervoe identified this man as Easter, and in 2022, testified that Easter "looked similar."

around the couch, including a toolbox and a shoebox. Officers administered first aid, which was continued by paramedics when they arrived, but Janice died shortly thereafter of blood loss.

One of Janice's daughters, Tasha Sargent, testified that earlier that evening, around 5:00 or 5:30 p.m., she and her children went by the Easter house and stayed for about 45 minutes. When Sargent asked her mother about Easter, Janice said "[h]e was not there," and seemed "tense." When the prosecutor showed Sargent a photograph of her mother's living room as the police found it after the murder, with various items on and around the couch, Sargent identified the items as belonging to Easter and stated that "my mom would never have things out like that on the couch."

Paris Washington, Sargent's older sister, also visited the Easter home on August 7, first at 8:00 a.m. and later at 1:00 p.m., each time in order to deliver some money to her. She also called her mother around 5:00 p.m. that evening to "remind her I was going to Vegas the next day and tell her about my hair and having girl talk." When the prosecutor asked, "In the time that you knew defendant Kevin Easter living [on] Army Street, did you ever see a firearm in the house?," Washington answered, "Yes," and when asked, "Did you tell your mom anything about that firearm," she answered, "I told her that she needed to somehow, some way get it out of the house because I believed it was a dangerous situation."

Meanwhile, around 3:00 a.m. the morning after the murder, Easter knocked on the door of his cousin, George Neal, on Linda Vista Avenue in Pittsburg. Easter told Neal that he had been in Stockton, that "someone had called him and said that his wife had been shot," and asked if Neal would take him to the police station. Neal did so, and Easter left behind some keys, his cell phone, and his cell phone battery on Neal's coffee table.

6

Dr. Arnold Josselson, a forensic pathologist, performed an autopsy on Janice on August 9, 2013. According to his testimony, Janice had been shot five times, but sustained six gunshot wounds because one of the bullets entered and exited her body twice. Three of those shots were fatal because they "went through the chest," causing a great deal of blood loss, such that Janice "essentially . . . bled to death." Dr. Josselson opined that Janice would have become unconscious "within less than five minutes" of being shot, and would have died "in less than ten minutes or so."

On December 12, 2013, a city worker retrieved a Taurus revolver from a storm drain at Front Street and Odessa Avenue in Pittsburg, around the corner from Neal's house on Linda Vista Avenue. The revolver contained five casings but no live rounds, and was marked with serial number DW63853.

The Taurus revolver could hold up to five bullets of two types: .38 special cartridges and .357–magnum cartridges. Ten .38-caliber bullets were found in Easter's home. After test firing the revolver, Contra Costa County Deputy Sheriff Criminalist Eric Collins opined that the revolver "more likely than not" fired four of the five bullets recovered from the crime scene, and that it was "possible" it fired the fifth bullet as well, although "[t]here was just not enough detail there to draw a conclusion."

**The Jury Deliberations and Verdict**

On December 7, after having deliberated for less than two hours, the jury found Easter guilty of first degree murder and possession of a firearm by a felon, and found the firearm enhancement true.

On December 12, after the prosecutor dismissed one of the prior strike allegations as duplicative, the trial court found the remaining three prior strike allegations and the two prior serious felony convictions true.

**Sentencing**

At sentencing on February 17, 2023, the trial court struck the firearm enhancement and the two five-year prior serious felony enhancements in the interests of justice under section 1385. The trial court then sentenced Easter to 25 years to life on the first degree murder conviction, tripled by operation of the Three Strikes Law to 75 years to life, and to the middle term of two years on count 2, but stayed execution of the sentence on that count pursuant to section 654, resulting in a total indeterminate term of 75 years to life.

Easter filed a notice of appeal.

## DISCUSSION

**1. There Was No Prejudicial Error With Respect to Evidence of Officer Sibbitt's Request that Dispatch Run a Check for the Murder Weapon's Serial Number**

**Additional Background**

As one of his motions in limine, defense counsel moved to exclude "the record of radio communications generated by Officer Sibbitt on or about 8/4/13 . . . unless and until the reliability of . . . Officer Sibbitt[] is established." The trial court took the matter under submission. Two days later, in discussing the motion with counsel, the trial court stated, "[t]his is one of these types of motions where I need to see what happens at trial and what foundation, if any, is laid. I need to see how [the prosecutor] is going to try and introduce this evidence, if at all, by what mode. So please object at the time if you think he's doing so and in an improper way. There is no substantive ruling for me to make . . . [¶] . . . [¶]. . . one way or another at this time."

Several days later when defense counsel again raised the issue, the trial court stated, "I'm completely fine at some point working in argument or even a [Evidence Code section] 402 hearing, if needed, to address that so that

8

both sides have clear guidance from me about opening statements . . . [b]ut let's not delay jury proceedings further today." The trial court made a "note to myself that this is a lingering in limine issue that we have to resolve."

The next day, defense counsel again raised the issue of the motion, and the parties offered brief argument, with the prosecutor arguing that even if Officer Sibbitt did not testify, the CAD log was still admissible under the business record exception to the hearsay rule, and defense counsel arguing that the evidence was not admissible as a business record unless there were independent indicia of Officer Sibbitt's reliability. The trial court then ruled that "to the extent the defense is seeking an advisory ruling from me now excluding this evidence without first a [Evidence Code section] 402 hearing where Sibbitt appears to establish independent reliability, that's denied," but "without prejudice . . . to . . . waiting for the record to occur."[5]

On the first day of trial, during the testimony of Erinn Riley—the dispatch supervisor for the Contra Costa Sheriff's Department—the prosecutor asked several questions about the background of computer-aided dispatch logs, and then showed Riley an exhibit Riley described as "a CAD log dated 8/4 of '13." Defense counsel objected on hearsay and foundation

---

[5] The trial court explained: "A lot has to play out for me to make a final determination here. Assuming that Mr. Sanders can lay a foundation for the CAD log as a business record . . . which simply records that certain events happened and that the people entering this data into the system were under a business duty to do so, I don't presumptively see, assuming that can be laid, an admissibility problem per say. But I also don't know whether Officer Sibbitt will be brought to the stand or not. I don't know whether Officer Davis will be brought to the stand, what he might testify to. I don't know whether they'll simply be relying on the document to prove that this event occurred. In other words, this serial number was read into police dispatch by Officer Sibbitt. Or whether they're asking me to accept it for its truth and let the jury accept it for its implied truth, that he looked at a particular gun in the house at that point, and it had a particular number on it."

9

grounds. After the prosecutor indicated that he was "moving to introduce the exhibit to establish that certain actions were taken by law enforcement at given times," and "not seeking to admit [any potential hearsay content] for its truth," the trial court overruled the objection, and immediately admonished the jury that they should consider the exhibit "as a record of what various officers did and the time that they did it on the night of," but were "not to consider it for its truth."[6]

When the prosecutor asked Riley about Officer Sibbitt's request that dispatch query a firearm's serial number, defense counsel again objected on hearsay grounds, and eventually made a standing objection, which objections the trial court overruled, "[f]or the limited purposes I mentioned."[7] Riley then testified that, according to the CAD log, while inside the Easter residence, Officer Sibbitt asked dispatch to query a firearm with serial number DW63853.

---

[6] The trial court's full admonition was as follows:

"Ladies and gentlemen, I'm admitting the exhibit. For the current purposes, you can consider it as a record of what various officers did and the time that they did it on the night of. If there's anything in the log where the officers are relating a statement or information that implies that they took a statement or did something off record, you're not to consider it for its truth.

"So as a record of the officers doing certain things at a given time, it's admitted for that purpose only at this point over objection. And we can reserve further sidebar if we need to expand the admissibility of the exhibit. It is in. It's admitted."

[7] The trial court's admonition was as follows:

"Folks, I'm allowing the answer as a record of what Officer Sibbitt did at that time. To the extent the substance of the answer implies that Officer Sibbitt did or spoke to people at the scene, received certain information, you're not to consider that for its truth since we don't have Officer Sibbitt here. But as a record of what he did at the time, I'm admitting it over objection."

The next day, defense counsel sought to make sure that his objection to admission of the CAD log was in the record, and the prosecutor responded that the log "was I believe admitted under [Evidence Code sections] 1271 and 1280 . . . since the custodian of records testified and she was person who authenticated it back in 2013." The trial court indicated that "my ruling yesterday admitting the CAD log stands," but without prejudice to defense counsel "renew[ing] a motion to strike later in the trial if Mr. Sanders [the prosecutor] doesn't establish the relevance or if you're worried that the lingering potential hearsay value will still be considered by the jury."

Later, after the close of the prosecution's case, defense counsel asked to "renew[] our hearsay and foundation objections to strike the serial number that was transmitted" because "[t]here is now no foundation that's been put in as to what it was describing, a business record, what condition or event it's describing, as required." After the trial court twice confirmed that defense counsel was not asking "to strike the CAD log from the record entirely and instruct the jury to disregard it," but rather to have the court "strike the serial number itself and to admonish the jury about it," the prosecutor argued that the relevance of the serial number was "circumstantial evidence of the hole in the ground of the floor found later,"[8] and "of the ammunition found in the residence three days later."

The trial court "agree[d] with [defense counsel] on this," concluded that "[t]he relevance, if any, for a circumstantial chain of reasoning is minimal; and it's exceeded in large part by substantial risk of prejudice," and indicated that "I'm going to grant the defense motion and will re-admonish the jury about that," "the fact that [Officer Sibbitt] ran a firearm, let alone, a firearm

---

[8] Tasha Sargent had testified that, at some unspecified time, she saw a small hole in the floor of the living room in the Easter home.

11

with that serial number . . . will be stricken," and "[t]he jury will be directed to disregard those." The trial court concluded that "[t]he rest of the CAD log . . . is admissible."

The trial court later admonished the jury as follows:

"Folks, there's one exhibit, People's 16. It was characterized as what's called a CAD log. It is a record of police activity heading to the Easter residence a few days before the death. So on August 4, 2013, you may remember that. I did admit the exhibit at the time, although I gave you some directions to limit your consideration of its contents a bit. [¶] . . . [¶]

"At this time, based on how the trial evolved and the rest of the evidence played out, this remains in evidence. You still can consider it. It's still admissible evidence.

"However, the testimony that—the part of this exhibit and the testimony relating to it where you received testimony that Officer Sibbitt requested, at a time when he was in the home on the detail, to run a records check on a particular firearm of a particular serial number. The fact that he requested while in the home that a registration be done on a firearm, period, let alone a firearm of a particular serial number, that's stricken from the record in its entirety on my order. You must disregard that information that you heard during the course of the trial. You cannot consider it for any purpose.

"So to the extent that's written in here or mentioned in here or that there was testimony about that on the record, it is stricken. You must disregard it. I won't go into the reasons why we did not hear from Officer Sibbitt in this trial. But bottom line is, the evidence that you received relating to the CAD log, both the testimony explaining it and the contents of the log itself, it remains admissible, but for, the testimony and contents

12

asserting that Officer Sibbitt requested that records check on a particular firearm of a particular serial number. The rest of it is in.

"So if Officer Sibbitt is mentioned as someone in that exhibit who went to the scene and you heard that from other officers as well, that remains admissible evidence. But his act of requesting a firearm be run for registration of a particular serial number is stricken. You must disregard it for all purposes and not consider it at all during your deliberations."

The trial court then polled the jury, asking whether there was any juror who did "not understand my order" or "cannot follow that order," and no jurors raised their hand.[9]

**Discussion**

Easter argues that the trial court "should have realized" earlier that the CAD log would ultimately be inadmissible and irrelevant for any non-hearsay purpose, and that in "ruling that it would need to wait until the court learned whether the prosecutor 'is going to try and introduce this evidence,'" the trial court caused incurable prejudice to the defense. He also argues that the testimony regarding the serial number violated his rights

---

[9]     Later, as part of the jury instructions prior to deliberations, the trial court instructed the jury pursuant to CALCRIM No. 303 as follows:

"During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.

"So just as one example, folks, I may have at certain points . . . allowed you to consider some hearsay testimony only for its impact on the witness and whether they did subsequent investigation but not for the truth of the statements of the out-of-court witnesses. That's one example of circumstances during trial where I limited your consideration of testimony for certain purposes. So, again, you're bound by those rulings throughout trial."

13

under the confrontation clause of the Sixth Amendment and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

The Attorney General makes several arguments in response. First, he argues that Easter has forfeited any argument that the trial court's admonitions to the jury were insufficient to cure any prejudice by failing to so argue to the trial court, and by failing to move for a mistrial or a new trial on this basis. Second, he argues that the CAD log itself was admissible under the business record exception to the hearsay rule, and that Officer Sibbitt's request that dispatch run a records check on serial number DW63853 was just a request, that a request has no truth or falsity to it, and therefore it cannot be hearsay. Third, he argues that the trial court had discretion under Evidence Code section 403 to conditionally admit the evidence while preserving the option to later strike it if the prosecution failed to demonstrate its relevance. Fourth, he argues that Easter's rights under *Crawford* were not violated. Fifth and finally, he argues that any error was harmless.

To begin with, we agree that Easter has forfeited his argument. As noted, the trial court ultimately granted defense counsel's motion along with the relief requested, admonishing the jury that "[t]he fact that [Officer Sibbitt] requested while in the home that a registration [check] be done on a firearm, period, let alone a firearm of a particular serial number" was "stricken from the record in its entirety," and that the jury must "disregard" it and "not consider it for any purpose." Defense counsel did not argue below this admonition was insufficient to avoid any potential prejudice, nor did he request a different admonition. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 728 ["To the extent defendant contends on appeal that the trial court's admonition was insufficient, he forfeited such a claim by failing to request a different admonition"].) And if Easter believed that he had suffered prejudice

14

incurable by admonition, it was incumbent upon him to move for a mistrial on that basis.[10] "[A] defendant who receives a curative admonition, but who makes no other objection and seeks no other action, may not complain on appeal. Defendant may not argue that the court should have granted a mistrial he did not request . . . ." (*People v. Chatman* (2006) 38 Cal.4th 344, 368; see *People v. Carrasco* (2014) 59 Cal.4th 924, 965 [same].) Easter did neither, and accordingly his argument is forfeited. Likewise with respect to Easter's confrontation clause argument, which he never raised at all before the trial court. (See *People v. Lewis & Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [confrontation clause argument waived where "[t]here was neither a 'specific' nor 'timely' objection below predicated on the Sixth Amendment's confrontation clause"].)[11]

---

[10] On reply, Easter asserts that "no rule or precedent exists that requires a criminal defendant to move for a mistrial upon the introduction of inadmissible evidence, particularly when the evidence was admitted pursuant to an earlier ruling of the trial court," going on to cite authority regarding the standard of our review of the denial of a motion for a mistrial, and concluding, with no citation to authority, that "[t]he fact that trial counsel opted not to move for a mistrial as a tactical matter is irrelevant." But Easter did not move for a mistrial, and so it is the standard of our review of such a motion that is "irrelevant," not the fact that Easter did not file such a motion at all—which, as discussed, is not irrelevant but indeed, dispositive.

[11] On reply, Easter argues that his argument is not forfeited because "[o]nce the trial court had ruled how it intended to proceed[], to do more than defense counsel had already done in objecting to the introduction of the evidence would have been futile." But we do not understand how this can be the case, given that the trial court expressly reserved making a final decision on the issue in order to see how the prosecution would develop the record, and once it had done so, agreed in full with defense counsel's position.

In addition—and for the first time—on reply, Easter argues that his confrontation clause argument is not forfeited, relying on *People v. Partida* (2005) 37 Cal.4th 428, 435 and asserting that his argument is "merely an expansion of the argument made at trial." We decline to consider this

In any event, Easter's argument fails on its merits. Because the trial court admonished the jury not to consider the statement at issue for its truth from the moment it was introduced into evidence, and ultimately ordered the jury to "disregard" it entirely and not to "consider it for any purpose," Easter's argument depends entirely on the assumption that the jury failed to obey those instructions. But the law is pellucidly clear that we must assume the opposite. As our Supreme Court explained in *People v. Homick* (2012) 55 Cal.4th 816: " 'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' " (*Id.* at pp. 866–867; see *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury"]; *People v. Lindberg* (2008) 45 Cal.4th 1, 26; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) Thus, as our Supreme Court stated in *People v. Turner* (1994) 8 Cal.4th 137, in words equally applicable here, "the jury was repeatedly instructed that they were not to consider [the alleged hearsay] statements for the truth of the matter asserted . . . [and] [w]e presume that the jury followed the court's

_____

argument, raised for the first time in Easter's reply brief. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"].) In any event, as we next discuss, because we must assume the jury did not consider the statement for its truth, his confrontation clause argument fails on the merits. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 681 ["Neither the hearsay doctrine nor the confrontation clause is implicated when an out-of-court statement is not received to prove the truth of a fact it asserts"].)

instructions." (*Id.* at p. 190; see *People v. Chavez* (2018) 22 Cal.App.5th 663, 705 ["Absent affirmative evidence in the record showing otherwise, we presume the jury followed the court's instruction and considered [the testimony] only for its [limited purpose] and not for its truth"].) Easter has pointed to nothing in the record that would overcome that presumption here.[12]

---

[12] The four cases Easter cites in arguing that limiting instructions may not be effectual could not be more inapposite. He begins with colorful language from *United States v. Garza* (5th Cir. 1979) 608 F.2d 659, 666: " '[I]f you throw a skunk into the jury box, you can't instruct the jury not to smell it.' " But that case involved extensive inappropriate commentary by the prosecutor in closing argument regarding the "critical credibility choice" faced by the jury, in which "he introduced for the jury's consideration his own personal opinion as to this choice, suggested the existence of information beyond that presented at trial to support his witnesses' credibility, and sought to use the status and influence of the entire government investigatory apparatus to bolster the believability of his case," such that it was "impossible to imagine this strategy did not have substantial influence on the jury." (*Id.* at pp. 665–666.) This case is a far cry. And Justice Jackson's concurring opinion in *Krulewitch v. United States* (1949) 336 U.S. 440, in which he wrote that "[t]he naive assumption that prejudicial effects can be overcome by instruction to the jury [citation], all practicing lawyers know to be unmitigated fiction," was discussing the "difficult situation" faced by a defendant charged with conspiracy "proved by evidence that is admissible only upon assumption that conspiracy existed," not the ordinary evidentiary admonition at issue here. (*Id.* at p. 453 (conc. opn. of Jackson, J.).) The third case cited by Easter—*People v. Cardenas* (1982) 31 Cal.3d 897—concluded the trial court abused its discretion in admitting evidence the defendant and his witnesses were affiliated with a youth gang, where there was no limiting instruction at all. (*Id.* at p. 904.) And in *People v. Gibson* (1976) 56 Cal.App.3d 119, the Court of Appeal concluded that testimony regarding defendant's prior criminal acts should have been excluded under Evidence Code section 352, and that the resulting prejudice was not cured by instructing the jury that it could consider the evidence for intent and motive but not propensity. (*Id.* at pp. 127–131.) But our Supreme Court has explained that prior bad acts evidence "may be highly inflammatory" (*People v. Davis* (2009) 46 Cal.4th 539, 602) and " 'is so prejudicial that its admission

17

**2. The Prosecutor Did Not Commit Misconduct in Referring to the Serial Number in Opening Statement**

Easter argues that the prosecutor committed misconduct when he "kept silent during the in limine motions and also later during trial when the subject arose of whether Officer Sibbitt would be available to testify," although "the record discloses he could not possibly have not been aware that Sibbitt would not testify." According to Easter, this is so because of "the fact that Officer Sibbitt did not testify at the first trial and had indicated his intention to invoke his rights under the Fifth Amendment and the prosecutor provided no reason from which it could be adduced that that issue had been resolved."

"[A] prosecutor's 'misbehavior "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] 'Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' [Citation.] When, as here, misconduct is asserted 'based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citation.]" (*People v. Nadey* (2024) 16 Cal.5th 102, 184 (*Nadey*).)

Generally, prosecutorial misconduct claims are forfeited unless the defendant makes a timely and specific objection at trial and requests that the jury be admonished to disregard the improper statements. (*Nadey, supra,* 16

---

requires extremely careful analysis' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404), distinguishing *Gibson* from the case before us.

18

Cal.5th at p. 185.) "Failure to raise a timely objection and request an admonition will be excused only ' "if doing either would have been futile, or if an admonition would not have cured the harm." ' [Citation.] However, ' "[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." ' [Citation.]" (*Ibid.*)

Because defense counsel failed to object to the prosecutor's mention of the serial number during opening statement, his argument is forfeited. (*Nadey*, *supra*, 16 Cal.5th at p. 185.) In any event, it fails on the merits.

Easter's brief contends that the prosecutor not only "kept silent . . . when the subject arose of whether Officer Sibbitt would be available to testify," but "[i]ndeed, he even affirmatively indicated that he expected that the former officer would be available to testify," with citation to pages 3307 and 3308 of the reporter's transcript. But this is simply a misrepresentation of the record. The cited pages contain the prosecutor's representation that "Officer Davis is available" to testify, but no representation by the prosecutor regarding Officer Sibbitt.

Easter also asserts that the prosecutor committed misconduct when he "extensively discussed the fact of the weapon being found" during opening statements, although he does not provide any citations to the record in support of this assertion, which is fatal to his argument. (See California Rules of Court, rules 8.204(a)(1), (a)(1)(C) ["Each brief must . . . [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [" '[i]f a party fails to support an argument with the

19

necessary citations to the record, . . . the argument [will be] deemed to have been waived' "].)[13]

In support of his argument, Easter relies on the rule that "[i]t is . . . misconduct for a prosecutor to make remarks in opening statements or closing arguments that refer to evidence determined to be inadmissible in a previous ruling of the trial court." (*People v. Crew* (2003) 31 Cal.4th 822, 839; see *People v. Fusaro* (1971) 18 Cal.App.3d 877, 886 ["[t]he deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct"].) But " ' "remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' " ' (*People v. Dykes* (2009) 46 Cal.4th 731, 762.)" (*People v. Parker* (2022) 13 Cal.5th 1, 72.) Obviously, this rule is inapplicable here, where the trial court had not only never ruled that the evidence was inadmissible, but instead had expressly reserved decision on that issue.[14]

---

[13]     In fact, the prosecutor only twice referenced the serial number during opening statement, telling the jury that "Officer Sibbitt . . . made contact to the dispatcher requesting a serial number check for DW63853," and later that a city worker "retrieved an item which the officers collected, seized into evidence. And it was a revolver. The serial number DW63853."

[14]     Given our conclusion that there was no misconduct, we need not reach the three-part test for prejudice relied on by Easter and set forth in *People v. Barajas* (1983) 145 Cal.App.3d 804, 809: "First, was an objection lodged or a motion in limine made? [Citations.] Second, was the jury informed by the court or by the prosecution opening statement is not evidence? [Citations.] Third, did opening statement result in a violation of the defendant's Sixth Amendment right to confrontation?" But we observe that no part of that test is satisfied here. Defense counsel never sought to limit the prosecutor's opening statement, nor did he object during the statement itself. Just before opening statements began, the trial court told the jury, "The statements of counsel are not evidence themselves, but this is their opportunity to frame for you kind of a summary of what they think the evidence will show." And as

20

### 3.  The Trial Court Did Not Prejudicially Err in Admitting Certain Hearsay Statements by Janice Easter and Easter's Prior Acts of Domestic Violence Against D.C. under Evidence Code Section 1109

Before trial, the prosecutor moved in limine to admit testimony from Tasha Sargent regarding two statements allegedly made by Janice:  (1) Sargent's proffered testimony that Janice told her, in response to a question about where Easter was on August 7, 2013, that "they had been arguing over the weekend and she kicked him out," pursuant to the hearsay exception for a declarant's then-existing state of mind (Evid. Code, § 1250); and (2) Sargent's proffered testimony that a "couple months prior" to August 7, Janice told her that she "awoke to find [Easter] standing over her with a baseball bat threatening to kill her," and that he told Janice "he was going to kill her with the bat and nobody would know she was dead in the house," pursuant to the hearsay exceptions for state of mind and a threat of infliction of injury (Evid. Code, § 1370).

**Two Out-of-Court Statements of Janice Easter**

With respect to Janice Easter's first statement, the trial court denied the prosecution's motion to admit it, finding that "even if offered for the reason requested by the People to prove the defendant's state of mind, motive, or conduct on that particular day, I would have to assume or the jury would have to find the statement itself to be true that they had a fight of some sort, an argument, and that she actually kicked him out."  The court denied the motion without prejudice to the prosecution "attempting to prove

---

already discussed, because the jury was instructed not to consider the statement at issue for its truth, and ultimately to disregard it altogether, the confrontation clause is not implicated. (See *People v. Sanchez, supra,* 63 Cal.4th at p. 681 ["Neither the hearsay doctrine nor the confrontation clause is implicated when an out-of-court statement is not received to prove the truth of a fact it asserts"].)

what the defendant's state of mind was through other circumstantial evidence," in which case the trial court indicated that "then, with a limiting instruction that it couldn't be considered for its truth but only for effect on hearer, I would consider admitting it."

After hearing argument from the parties, the trial court concluded that the statement should not be admitted for its truth, but that it could potentially be admissible to show Janice's state of mind, provided that testimony established that the statement was made on the day of the murder and that Easter's clothing "was moved to the couch because that's what [the prosecutor is] trying to explain." The trial court then advised defense counsel that "if the evidence at trial doesn't come out the way that [the prosecutor] predicts, you can renew your objection at that time and I'll make a ruling on the spot."

With respect to Sargent's testimony regarding Janice's statement describing the incident with the baseball bat, after again hearing argument from counsel, the trial court concluded that the statement could not be admitted for its truth, but could presumptively be admitted under Evidence Code section 1250, "again, assuming [the prosecutor] can establish the relevance of her state of mind towards the defendant and to explain conduct relating to the homicide day . . . without prejudice to [defense counsel] making a contemporaneous objection at time of trial."

A few days later, defense counsel filed a motion for reconsideration of the trial court's determination that Janice's statement about the baseball bat was admissible pursuant to Evidence Code section 1250. The next day, after hearing further argument, the trial court denied the motion.

Before Sargent's testimony, defense counsel renewed his objection to her proffered testimony regarding the incident with the baseball bat, and the

22

trial court responded that "I think we need to wait and see what happens," and that "at the time [the prosecutor] ask[s] the questions soliciting that evidence, the onus is on the defense to object if it thinks insufficient foundation has been laid and we'll take it from there."

Sargent then went on to testify in relevant part as follows:

"Q. When you were with your mom that day on the 7th, that evening talking to her, did you ask her about Kevin?

"A. Yes.

"Q. And did she indicate whether or not she was arguing with Kevin that day?

"A. I don't recall.

"Q. Has your mom ever kicked Kevin out of the house?

"A. Yes.

"MR. SANDERS [prosecutor]: Your Honor, may we approach in chambers very briefly?"

After a brief sidebar held off the record, her testimony resumed:

"Q. Ms. Sargent, did you ever have a conversation with your mom in which she told you about an incident in which Kevin Easter threatened her with an object?

"A. Yes.

"MR. BURACK: Your Honor, at this point, as the Court has instructed we're going to lodge our objection under the grounds of relevance, not appropriate, Evidence Code 1250 evidence, as well as foundation.

"THE COURT: Okay. Consistent with our previous discussions, Counsel, both sidebar and before, the objection is overruled.

"Folks, I'm going to allow some inquiry by Mr. Sanders with Ms. Sargent into a brief conversation that she may have had with her mother

23

about a prior incident involving Mr. Easter.  This—the answers provided by Ms. Sargent may only be used by you as it might explain Ms. Easter's state of mind at the time of these events, the previous event and potentially leading up to the evening of her death.  You cannot accept and use the testimony as evidence for its truth that there was a prior incident, that certain things happened, that Mr. Easter may or may not have done things to her.  That's hearsay.  You cannot use it for that purpose.  Okay.  There's no witness for that.  Ms. Easter will not testify to that.  And my understanding is there will be no witness who can testify to that.

"So while you're allowed to receive this testimony over defense objection, you're not allowed to use and accept it for its truth that there was a prior incident of this nature.  You can use it as a statement by Ms. Easter to her daughter about Ms. Easter's state of mind about the state of the relationship with Mr. Easter.

"Everyone understand?  [¶]  A lot of nodding heads.  [¶]  All right.  With that limitation, the objection is overruled.  I'll allow the objection to remain standing for this subject matter, Mr. Burack, so you don't have to repeat it each time."

Sargent went on to testify that in November of 2012, Janice told her that Easter threatened her with a baseball bat, and "told her he would take the bat and beat her to death, lock her in the house, and no one would find her."

**Discussion**

We review the trial court's ruling on whether to admit evidence, along with its determination of issues concerning the hearsay rule, for abuse of discretion (*People v. Clark* (2016) 63 Cal.4th 522, 590), that is, we ask whether the ruling " 'falls outside the bounds of reason.' " (*People v. Osband*

24

(1996) 13 Cal.4th 622, 666.) And we easily conclude that the trial court's ruling here did not.

According to the prosecution's motions in limine, Sargent's proffered testimony was that on August 7, 2013—the day of the murder—she "asked her mother where Kevin (defendant) was, to which Ms. Easter responded 'they had been arguing over the weekend and she kicked him out.' " But Sargent's testimony on this point was ultimately only the answer "Yes" to the question, "Has your mom ever kicked Kevin out of the house?" The parties dispute whether Janice's statement to Sargent that she had thrown Easter out of the house qualifies for the hearsay exception for a "statement of the declarant's then existing state of mind" (Evid. Code, § 1250). But Sargent's testimony as it ultimately took place did not contain any statement by Janice, and was therefore not hearsay. (See Evid. Code, § 1200, subd. (a) [" 'Hearsay evidence' is *evidence of a statement that was made other than by a witness* while testifying at the hearing and that is offered to prove the truth of the matter stated"], emphasis added.)

As for Sargent's testimony to Janice's statement that Easter told her "he would take the bat and beat her to death, lock her in the house, and no one would find her," just before this testimony, the trial court admonished the jury that it could "only be used by you as it might explain Ms. Easter's state of mind at the time of these events," and could not "use the testimony as evidence for its truth that there was a prior incident, that certain things happened, that Mr. Easter may or may not have done things to her." The Attorney General concedes that the statement was not admissible pursuant to Evidence Code section 1250 as "a statement of the declarant's then existing state of mind," (Evid. Code, § 1250, subd. (a)), but argues it was admissible as evidence of a prior act of domestic violence pursuant to Evidence Code section

25

1109. On reply, Easter argues that prior domestic violence must still be proved by admissible evidence, with citation to *People v. Gobert* (2023) 89 Cal.App.5th 676, 682, 684: "[Evidence Code s]ection 1109, subdivision (a)(1) is not a hearsay exception. Nor does it independently authorize the admission of hearsay. . . . [¶] . . . . ¶] [E]vidence . . . [of] Gobert's past acts of domestic violence is only relevant to show Gobert's propensity to commit future acts *if* the past abuse occurred—that is, only if the declarant's statements are true. Because the use of this evidence to show propensity under section 1109 was inadmissible hearsay, and any nonhearsay use of the evidence was not relevant, the trial court erred in allowing it."

We think Easter has the better of this argument. However, we conclude that he has failed to demonstrate prejudice from the alleged error. "Even if a trial court abuses its discretion in admitting hearsay evidence, we do not reverse unless there is a reasonable probability the defendant would have achieved a more favorable result absent the out-of-court statement." (*People v. Lozano* (2024) 101 Cal.App.5th 366, 381–382, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) [15] As noted, just before Sargent testified to the statement, the trial court instructed the jury not to consider it for its truth, and as already extensively discussed, we presume the jury followed those instructions. (See *People v. Homick*, *supra*, 55 Cal.4th at pp. 866–867; *People v. Waidla*, *supra*, 22 Cal.4th at p. 725.) And the sum total of Easter's argument regarding prejudice is that admission of the statement "was prejudicial in that it was used by the prosecutor, along with all the propensity evidence improperly admitted, to argue that appellant had a 'motive' to commit the crime which led to his argument that the murder was

---

[15] Easter does not contend that any other standard of prejudice is applicable.

of the first degree." But the prosecutor's argument regarding motive was that Easter killed Janice because she was "in the beginning stages of the process" of "kicking him out." As to this, the prosecution relied on the photograph of Easter's belongings gathered around the couch at the time of the murder, together with Sargent's testimony that "my mom would never have things out like that on the couch." The fact of Janice's statement regarding the baseball bat incident added little to nothing to this evidence—if anything, it spoke only to *Janice's* motive in asking Easter to move out.[16] We conclude that Easter has failed to demonstrate a "reasonable probability [of] . . . a more favorable result" had the testimony not been admitted. (*People v. Lozano, supra,* 101 Cal.App.5th at pp. 381–382.)

### Prior Incidents of Domestic Violence Involving D.C.

The prosecution also moved in limine to admit evidence of two incidents of prior domestic violence pursuant to Evidence Code section 1109: (1) a March 2005 incident with respect to D.C.—whom Easter was "dating off and on for approximately 10 years" and with whom he had two children—that in March 2005 Easter threw a coffee table and metal plant holder at D.C.; and (2) that in November of that year, D.C. saw Easter in a parking lot and he confronted her, called her "a slut, whore, and bitch," drove after her when she walked away, got out of his car and "punched her in the head and kicked her in the thigh and stomach," and subsequently "went to her residence and . . . began punching and kicking [her] until she fell to the ground and

---

[16]     Indeed, the prosecutor's only reference to the statement in his closing argument discussed it in terms of Janice's motive: "I mean, according to Paris, she described her mom telling her that defendant threatened to kill her with a bat and that he would look [*sic*] the door and no one would know. That evidence you can use to understand Janice's state of mind as to why she's kicking the defendant out of this house, why she's trying to make her home safe."

27

curled into the fetal position." On April 24, 2006, as a result of this second incident, Easter was convicted by plea of misdemeanor corporal injury to a cohabitant (§ 273.5, subd. (a)).

The trial court ultimately ruled that both incidents involving D.C. were admissible under Evidence Code section 1109 as prior acts of domestic violence. The court found that the two incidents were "not so remote in time . . . to not be probative," that they were "probative to . . . counter the argument that any violence committed against the incident in this case was a one-off situation," that they "support the idea that there was a domestic violence propensity on the defendant's part," that they were "less serious than the charges before the Court, which is murder with a firearm," which "cuts in favor of admitting them and undercuts the potential prejudicial value of them." The court further found that the incidents would not involve an undue consumption of time because "they could be proven with one witness alone, [D.C.]" The trial court also ruled that the prosecution could "use the actual conviction for [Evidence Code] section 1109 purposes, as well as presenting the underlying conduct through the percipient witness, including [D.C.] and any officers that are necessary."

D.C. later testified briefly regarding the two incidents, and a certified copy of Easter's record of conviction was introduced into evidence.

**Discussion**

Easter argues that the trial court erred in admitting D.C.'s testimony regarding the two prior incidents of domestic violence against her pursuant to Evidence Code section 1109, and in admitting the certified record of his April 2006 conviction of misdemeanor corporal injury on a cohabitant (§ 273.5, subd. (a)).

28

Section 1109, subdivision (a)(1) provides, with certain exceptions not applicable here: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Easter does not dispute that he was " 'accused of an offense involving domestic violence.' " (*Ibid.*; see, e.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233–1237 [defendant was "accused of an offense involving domestic violence" within the meaning of section 1109 when he was charged with the first degree murder of his girlfriend because "murder is 'the ultimate form of domestic violence' "].)

"By its incorporation of section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact.[17] We review a challenge to a trial court's decision to admit such evidence for abuse of discretion. [Citations.]

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' [Citation.] Section 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' [Citation.] Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt

---

17     "Section 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' "

29

in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence.[18] [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531–532.)

Easter argues, in one brief paragraph, that "the incidents involving [D.C.] . . . were not in any manner similar to the murder" because "[o]ne of the incidents involved an argument that had ripened into mutual combat, and while [Easter] had thrown an object, he had not armed himself with a deadly weapon let alone a firearm," and that the trial court "did not appear to consider the question of similarity at all as required."

As to the former, we cannot entirely agree that the prior incidents of domestic violence were "not in any manner similar to the murder." The March 2005 incident, like the murder, involved acts of physical violence against D.C., with whom he was at the time cohabitating, and which evidently took place in their living room, as it involved damage to their coffee table and entertainment center. And the second incident also included Easter committing a violent assault against D.C. after he went to her residence and "found his clothing in a bag left outside," similar to the charged incident in which the prosecution argued that Easter murdered Janice after she gathered his belongings on and around the couch where she was killed, presumably in an effort to kick him out of the house. The fact that Easter

---

18      " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.' [Citation.]"

was not armed with a firearm during the prior incidents makes them more, not less, probative, because " '[t]he propensity inference [of Evidence Code section 1109]' " is aimed specifically at the " 'escalating nature of domestic violence.' " (See *ante*, fn. 18.)

As to the fact that the trial court did not expressly discuss the similarities between the prior domestic violence and the charged offenses, "we apply the general rule that 'that a trial court is presumed to have been aware of and followed the applicable law.' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398 [same]; *McDermott Will & Emery, LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103 ["We presume the trial court knew and properly applied the law absent evidence to the contrary"].) Easter has pointed to no evidence in the record to rebut that presumption here.

Although Easter does not challenge the trial court's Evidence Code section 352 analysis, we note that evidence of the prior assaults came from an independent source, which reduced the danger of fabrication and weighs in favor of admissibility. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at pp. 404–405.) In addition, Easter was convicted of one of the prior offenses. The fact that the prior misconduct had resulted in conviction reduced the likelihood that Easter could have produced evidence to rebut D.C.'s testimony. Therefore, the unfairness of forcing Easter to mount a defense against evidence of a long–past incident weighed less heavily against the admissibility of the evidence of the prior incidents of domestic violence in this case. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 915–916.)

Finally, Easter argues that the trial court erred in permitting the prosecution to admit the certified record of his conviction for corporal injury on a cohabitant (§ 273.5, subd. (a)) based on the second incident involving

D.C., under what he describes as the "rationale . . . that documentary evidence of a conviction is not a reliable indicator of the underlying conduct"—a "rationale" he purports to derive from *People v. Chatman* (2006) 38 Cal.4th 344 (*Chatman*). (See *id.* at p. 373 [finding no abuse of discretion in trial court's decision not to admit evidence of conduct underlying conviction for misdemeanor giving false information to a peace officer].) But even if *Chatman* stands for such a "rationale," surely it has no application here, where D.C. also testified at trial to the conduct underlying Easter's conviction. And as Easter acknowledges, the proposition that the trial court may not admit a record of conviction in place of live testimony under Evidence Code section 1109 has been rejected by at least one recent decision of the Court of Appeal. (See *People v. Robinson* (2024) 99 Cal.App.5th 1345, 1359 [trial court did not abuse its discretion in admitting record of conviction under Evidence Code section 1109 "rather than [through] more time-consuming live witness testimony"].) In any event, even assuming error, Easter offers no argument that such error was prejudicial, and given D.C.'s testimony to the conduct underlying his conviction, we can discern none.

> **4. Easter Has Not Established His Trial Counsel Provided Ineffective Assistance In Failing to Object to Paris Washington's Testimony that She Saw a Firearm in the Easter Home**

Easter's next argument is that his trial counsel provided ineffective assistance by failing to object to the "testimony of Paris Washington . . . includ[ing] . . . observations" that Easter "had possessed a gun on prior occasions."

To begin with, and again, Easter's brief provides no citation to the record identifying the testimony at issue, which, as discussed with respect to his allegation of prosecutorial misconduct, provides the first reason we will

reject his argument. (See California Rules of Court, rule 8.204(a)(1), (a)(1)(C).)

The argument also fails on its merits.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] . . . If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' ([*People v.*] *Ledesma* [(2006)] 39 Cal.4th [641,] 745–746; see *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)" (*People v. Bell* (2019) 7 Cal.5th 70, 125–126.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more

33

appropriately resolved in a habeas corpus proceeding.  [Citations.]"  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

With respect to firearms, Paris Washington testified, without defense objection, as follows:

"Q.  In the time that you knew defendant Kevin Easter living [on] Army Street, did you ever see a firearm in the house?

"A.  Yes.

"Q.  Did you tell your mom anything about that firearm?

"A.  I told her that she needed to somehow, some way get it out of the house because I believed it was a dangerous situation."

The prosecutor's questioning then moved on to another topic.

Easter argues that his trial counsel was ineffective in failing to object to this testimony, relying on the rule, established by our Supreme Court in *People v. Riser* (1956) 47 Cal.2d 566, 577 (*Riser*), that "it is generally error to admit evidence that the defendant possessed a weapon that could not have been the one used in the charged crime."  (*People v. Sanchez* (2019) 7 Cal.5th 14, 55; see *Riser*, *supra*, 47 Cal.2d at p. 577 ["When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons"].)  He asserts that "not only were both[19] incidents of the gun possession well before the charged offense, no nexus whatsoever was established with the events of August 7, 2013," and "[t]hus, the admission of evidence, through the testimony of Paris Washington, that

[19]    It is unclear what Easter's brief means by "both."  As noted, Washington testified only that she had seen a firearm in the Easter home at some unspecified time.

34

years earlier he was in such possession as well, where there was no evidence[] it might have been the murder weapon, was error."

To begin with, the rule of *Riser* does not apply here, because it was not the case that a firearm in the Easter home "could not have been" the murder weapon. (*People v. Sanchez, supra*, 7 Cal.5th at p. 55.) Quite the opposite, given that Janice was killed with a firearm in her own living room.

The Attorney General posits that, in arguing that the gun possession took place "years earlier," Easter "is apparently relying on Washington's testimony at the previous trial," where she "testified that she saw [Easter]'s pistol 'two and a half years ago,'" that is, "two-and-a-half years before she testified . . . on November 2, 2015." And according to the Attorney General's brief, and as Easter does not dispute, at Easter's first trial Washington testified that "she attended Janice's birthday party at the Easter house on July 20, 2013—18 days before Janice was murdered. Washington testified that [Easter] 'decided to show me that he had a gun in the house for protection. And he was very flashy about it, and I looked at him and I asked him why does he have a gun? And he said, "It's just for protection," and that, "Your mother is aware because it's in her name." And after he did that, I went outside and told my mother what he said.' . . . [¶] Washington then testified that [Easter] showed her the gun in the living room. He opened the gun and showed her the bullets. Then [Easter] put it in his pants and walked outside."[20]

---

[20] On November 15, 2024, we granted Easter's request that we take judicial notice of the record in his previous appeal, including the reporter's transcript of Washington's testimony. On reply, Easter argues, without explanation, that the Attorney General's argument relying on Washington's former testimony "should be disregarded." But we fail to see why, especially since we took judicial notice of the record in his first trial, including Washington's testimony, at his own request.

The record thus discloses a rational tactical purpose for defense counsel's failure to object: As it stood, Washington's testimony left unclear *when* she saw a firearm in the Easter home, but objecting on the ground that the firearm was not sufficiently linked to the murder—in addition to being meritless—could well have prompted the prosecutor to attempt to lay a better foundation for her testimony, including by eliciting Washington's testimony that she saw the firearm only 18 days before the murder. Defense counsel, presumably familiar with Washington's prior testimony, may well have made the tactical decision that it would be preferable to leave it unclear in the minds of the jury exactly *when* Washington saw the firearm, rather than objecting and prompting the prosecution to clarify that she did so only 18 days before the murder took place. Because this rational tactical purpose could explain defense counsel's failure to object, Easter's claim of ineffective assistance must fail.

**5. The Trial Court Did Not Err in Instructing the Jury With CALCRIM No. 371 Regarding Flight and CALCRIM No. 372 Regarding Suppression of Evidence**

The trial court instructed the jury on suppression of evidence pursuant to CALCRIM No. 371 and on evidence of the defendant's flight pursuant to CALCRIM No. 372.[21] As Easter sidewise concedes, the trial court did so without objection by defense counsel.

Easter argues that it was error to give the flight instruction "for three reasons: first: because such an instruction is not be to [*sic*] given in a case

_____

[21]    The instructions as given read as follows:

"If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

36

where identity is at issue; second, because the court did not specify to whether it pertained to all forms of homicide or just first degree murder; and third, rather than fleeing, after arriving at Neal's residence, he actually went to the police department and surrendered." He argues that it was error to give the suppression of evidence instruction "because it suggested to the jury such evidence was supportive only of the theory that appellant had premeditated the crime and hence was guilty of first degree murder," and that the trial court should have clarified the instruction by telling the jury that " 'this evidence may be considered by you in deciding whether the defendant is guilty of murder, but not in deciding the degree of the murder', or words to that effect."

As the Attorney General argues, Easter's arguments regarding the instructions are plainly forfeited by his failure to object to them.

In arguing to the contrary, Easter cites *People v. Smith* (1992) 9 Cal.App.4th 196 (*Smith*), asserts that "[i]nstructional errors which affect a defendant's fundamental rights are reversible even without an objection by the defense where such failure . . . is inadvertent and not tactical," and thus essentially argues that his trial counsel's failure to object to the instructions was not invited error. (See *id*. at p. 207, fn. 20 ["[M]erely acceding to an erroneous instruction does not constitute invited error"].) But invited error and forfeiture are distinct doctrines. (See *San Mateo Union High School District v. County of San Mateo* (2013) 213 Cal.App.4th 418, 436 [discussing

_____

And:

"If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

37

the different doctrines]; *People v. Hampton* (2022) 74 Cal.App.5th 1092, 1103 [same].)  Under the forfeiture doctrine, a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court.  (*People v. French* (2008) 43 Cal.4th 36, 46.)  " 'The " 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal." [Citation.]  The purpose of the doctrine is to "prevent a party from misleading the trial court and then profiting therefrom in the appellate court." [Citation.]' " (*San Mateo Union High School District v. County of San Mateo, supra*, 213 Cal.App.4th at p. 436.)  "Invited error . . . will only be found if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Valdez* (2004) 32 Cal.4th 73, 115.)

Easter's reliance on *Smith* itself is unavailing.  There, the Court of Appeal held that the trial court violated its "sua sponte duty ' "[to] instruct on the general principles of law relevant to the issues raised by the evidence" ' " by giving an instruction that "incorrectly . . . permit[ted] a 'true' finding as to the [firearm enhancement under] section 12022, subdivision (c) . . . based solely on vicarious liability," "i.e., on the fact another principal was armed." (*Smith, supra*, 9 Cal.App.4th at pp. 206–207.)  Here, by contrast, the instructions as given were correct statements of the law.  Our Supreme Court has rejected numerous challenges to jury instructions related to consciousness of guilt, including those concerning flight and suppression of evidence, explaining that "[t]hese standard instructions explicitly state that any inference regarding guilt to be drawn from the circumstances described by them—a willfully false or misleading statement, destruction or suppression of evidence, and flight—is permissive and insufficient alone to

38

prove guilt." (*People v. Tully*, *supra*, 54 Cal.4th at p. 1024 [considering CALJIC consciousness of guilt instructions].) Our Supreme Court has also concluded the instructions are neither argumentative nor improperly favorable to the prosecution. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 142 [" 'cautionary nature of the [CALJIC consciousness of guilt] instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory' "]; *People v. Taylor* (2010) 48 Cal.4th 574, 630 [CALJIC consciousness of guilt instructions not impermissibly argumentative]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [CALJIC consciousness of guilt instructions not improperly pro-prosecution and do not lessen burden of proof], abrogated on other grounds by *People v. Lenix* (2008) 44 Cal.4th 602, 607.) While these cases concerned the CALJIC consciousness of guilt instructions, their reasoning is entirely applicable to CALCRIM Nos. 371 and 372. And the trial court "has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Easter's arguments are forfeited.

In any event, the arguments have no merit. As noted, Easter first argues that the flight and suppression of evidence instructions are "not be to given in a case where identity is at issue." But the only two cases Easter cites in claimed support actually expressly reject his argument. In *People v. London* (1988) 206 Cal.App.3d 896 (*London*), after acknowledging that "if identity is the *only* issue in a case, evidence of flight is irrelevant and the instruction is improper" (*id.* at p. 903), the Court of Appeal went on at length to consider and reject the further proposition that "withhold[ing] the flight

39

instruction [is required] whenever identity is *one* of the issues," concluding that "[i]f the People rely upon evidence of flight to show consciousness of guilt, then CALJIC No. 2.52 [flight] is proper," and that because "[o]verwhelming evidence of identity made it virtually certain that the jury would resolve that issue against the defendant and proceed to the issue of guilt . . . [t]o have withheld the instruction on flight would have hampered the jury's proper deliberations by forbidding a permissible inference from relevant evidence."[22] (*Id.* at pp. 902–906.) So too here—Janice was murdered in the living room she shared with Easter, and her murderer had the ability both to lock their front door and then to drive away in a vehicle known to belong to him, making it "virtually certain that the jury would resolve [the identity] issue against the defendant." (*Id.* at p. 906.) And in *People v. Mason* (1991) 52 Cal.3d 909, the defendant, as here, argued that the flight instruction is erroneous "whenever 'identity is a contested issue,' " and our Supreme Court "reject[ed] the argument," relying on *London* to conclude that "[i]f there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight." (*People v. Mason*, *supra*, 52 Cal.3d at p. 943; see *id.* at pp. 942–942.) Easter has failed to demonstrate error.

We likewise reject Easter's argument that giving the instructions was error because the trial court "did not specify . . . whether [they] pertained to all forms of homicide or just first degree murder," based on what he claims is

---

[22] *London* also held that "similar considerations" applied to an instruction on the destruction of evidence, concluding that such an instruction "has no place when the defense concedes that the person who destroyed evidence— whoever it may have been—committed the offense. But when the elements of the crime are also at issue the instruction serves a legitimate purpose." (*Id.* at p. 906.)

the rule that "[w]here multiple offenses may be in question, a clarification should be given as to which count the instruction applies." Again, the cases he cites stand for precisely the opposite proposition. In *People v. Crandell* (1988) 46 Cal.3d 833, abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 365–366, our Supreme Court rejected the argument that the trial court was required to limit the instructions on flight and suppression of evidence to certain charges, reasoning that "[t]he instructions do not assume the existence of evidence relating to each charge; they merely instruct the jury on the use of such evidence should it be found to exist. Accordingly, the instructions were neither erroneous nor irrelevant. If defendant desired limitation or clarification of the instructions, it was incumbent upon him to request it." (*Crandell*, *supra*, 46 Cal.3d at pp. 870–871; see *People v. Mendoza* (2000) 24 Cal.4th 130, 180 ["[i]t is for the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply"].)

Finally, Easter's argument that giving the instructions was "error in that once he believed he was suspected in the shooting[, he] turned himself in" deserves only brief mention. It was for the jury to determine what weight, if any, to give to the evidence of how and when Easter went to the police, and we do not revisit their determination on appeal. (See, e.g., *People v. Wilson* (2023) 90 Cal.App.5th 903, 916.)

### 6. There Was No Cumulative Error

Having concluded that Easter's challenges to his murder conviction are without merit, we in turn reject his claim of cumulative prejudice resulting

41

from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### 7. Substantial Evidence Supports the Jury's Finding of Premeditation and Deliberation

Easter's final argument is that insufficient evidence supports the jury's finding of premeditation and deliberation and thus its conclusion that he is guilty of first degree murder.

Our Supreme Court described the standard we apply to Easter's claim: " 'In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' (*People v. Smith* (2005) 37 Cal.4th 733, 738–739 (*Smith II*).) ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " ' (*Id*. at p. 739.)" (*People v. Alvarez* (2025) 18 Cal.5th 387, 470 (*Alvarez*); accord, *People v. Abillar* (2010) 51 Cal.4th 47, 60.)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a). ) "If the murder is 'willful, deliberate, and premeditated,' it is first degree murder. (*Id*., § 189, subd. (a).) ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate"

means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88; accord, *In re Lopez* (2023) 14 Cal.5th 562, 580; see *People v. Serrano* (2024) 100 Cal.App.5th 1324, 1333–1334; *People v. Disa* (2016) 1 Cal.App.5th 654, 664–665.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*), our Supreme Court "identified three factors commonly present in cases of premeditated murder:  '(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' "

43

(*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; see *People v. Morales*, *supra*, 10 Cal.5th at pp. 88–89; *People v. Serrano*, *supra*, 100 Cal.App.5th at p. 1333.)

However, "[o]ur high court has cautioned that *Anderson* ' "did not refashion the elements of first degree murder or alter the substantive law of murder in any way." [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." ' (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1081.) Thus, the *Anderson* 'factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation. [Citation.] However, "[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained." ' (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)" (*People v. Disa*, *supra*, 1 Cal.App.5th at p. 665; see *People v. Cage* (2015) 62 Cal.4th 256, 276 [" ' " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse' " ' ' "].)

We turn first to planning. Easter argues that there was no evidence of even "the slightest planning," because he did not "tell anyone of such a plan," "make any threats to kill Janice," nor "was there any indication that [he] . . . ma[d]e any realistic plans for an undetected getaway." But as the prosecutor aptly observed in his closing argument, a firearm is "not an object that one keeps in their pocket in their own home." And Easter's own brief acknowledges that "[t]he weapon was apparently stored in the house," and thus Easter must have therefore chosen to arm himself at least "shortly before he committed the crime." Viewed in the light most favorable to the

44

judgment, this evidence supports a reasonable inference that Easter retrieved the firearm from where it was stored, approached Janice, and subsequently shot her, and thus planned the murder, even if only "shortly" before it took place. (See *People v. Watkins* (2012) 55 Cal.4th 999, 1026 [finding that "carrying the loaded, concealed pistol [a short distance] to the position behind the hood of the truck" where defendant shot the victim was sufficient evidence of planning]; *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [evidence showed premeditation and deliberation where the defendant "armed himself with a loaded firearm, approached the victim, who was asleep at the bar, grabbed him and shot him repeatedly in the back from very close range"].) And even "planning activity occurring over a short period of time is sufficient to find premeditation." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Furthermore, multiple witnesses testified that after they heard the first shot, there was a "pause" of several seconds—and according to Marissa Avila, a "female scream"—before the others. Indeed, according to Willy Senn's testimony, the pause between the first shot and the subsequent four was long enough for him to call 911 and then to step out his front door onto his porch. The jury could reasonably infer from this evidence that Easter had time during this pause to reflect and consider his actions before choosing to shoot Janice four more times—at least two of which shots, according to the testimony of the pathologist who performed her autopsy, were independently fatal. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["[t]he act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind' "]; *People v. Pettigrew* (2021) 62

45

Cal.App.5th 477, 493 ["To repeat, what matters . . . is the extent of the defendant's reflection on his actions, not its *duration*"].)

As to motive, Easter argues that none was "ever established" as to why he would have decided to kill Janice "on that day and at that time," and there was "no evidence that something had unexpectedly occurred that day" that would have prompted such a decision. To the contrary, viewed in the light most favorable to the judgment, the evidence showed that only three days prior to the murder, Janice and Easter had some sort of domestic dispute resulting in a call to 911, and that as a result Easter agreed to—and evidently did—spend the night elsewhere. And shortly after the murder, the police arrived to find Easter's belongings gathered on and near the couch where Janice was shot, a photograph of which prompted Sargent to testify that "my mom would never have things out like that on the couch." Viewed in the light most favorable to the judgment, the jury could permissibly infer from this evidence that Janice had asked or insisted that Easter move out of the house, that he or she had begun the process of gathering his belongings to do so, and that he shot her in response and in retaliation.

As to the manner of killing, Easter argues that "tragically, the firing of even multiple shots can occur in a few seconds resulting from a state of mind in which the perpetrator is immediately regretful." Perhaps. But the jury here was amply justified in concluding otherwise based on the evidence. That evidence showed that Janice was shot five times—shots that produced six gunshot wounds because one bullet entered and exited her body twice— meaning that Easter fired every bullet in the Taurus revolver, and hit Janice with each and every shot. Three of these five shots would have been independently fatal. And far from acting in a way consistent with being "immediately regretful" after killing Janice, Easter instead left the house and

46

locked the door behind him, thereby delaying the arrival of the police—who, as noted, nevertheless arrived to find Janice still alive—and presumably, the subsequent arrival of the paramedics. Viewed in the light most favorable to the judgment, this manner of killing supports the inference that Easter acted with premeditation and deliberation. (See, e.g., *People v. Gonzales & Soliz* (2011) 52 Cal.4th 254, 295 ["The manner of killing—a close-range shooting without any provocation or evidence of a struggle—additionally supports an inference of premeditation and deliberation"]; *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing—multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant—is entirely consistent with a premeditated and deliberate murder"]; *People v. Bolin* (1998) 18 Cal.4th 297, 332 [the manner of killing supports a finding of premeditation and deliberation where "[b]oth victims died of multiple gunshot wounds, several of which would have been fatal individually"].)

In sum and in short, substantial evidence supports the jury's finding that Janice's murder " ' "occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Morales*, *supra*, 10 Cal.5th at p. 88.)

## DISPOSITION

The judgment is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A167502N)